IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA       )
                               )
            v.                 )        1:10CR411-1
                               )
BRUCE GREGORY HARRISON, III    )

## ORDER

Before the court is Defendant Bruce Gregory Harrison, III's *pro se* motion for compassionate release. (Doc. 180.) The Government filed a response opposing the motion. (Doc. 182.) For the reasons stated herein, Harrison's motion will be denied.

Harrison was found guilty after a jury trial on a 63-count superseding indictment that alleged obstructing the administration of Internal Revenue Service laws in violation of 26 U.S.C. § 7212(a), failure to collect and pay payroll taxes in violation of 26 U.S.C. § 7202, and failure to file individual tax returns in violation of 26 U.S.C. § 7203. (Doc. 127 at 1.) In October 2012, this court sentenced him to a total of 144 months of imprisonment and three years of supervised release. (Id. at 2-3.) The court also imposed restitution in the amount of $43,207,976.81. (Id. at 5.) Harrison is currently incarcerated at FCI Loretto and has an expected release date of May 22, 2022. (Doc. 182 at 4.)

"Federal law has long authorized courts to reduce sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, Pub. L. No.

115-391, 132 Stat. 5194, district courts could grant such reductions only upon a motion by the Director of the Bureau of Prisons ("BOP") under 18 U.S.C. § 3582(c)(1). United States v. Beck, 425 F. Supp. 3d 573, 577-78 (M.D.N.C. 2019). However, Congress amended § 3582(c)(1) when it passed the First Step Act. Pertinent here, the First Step Act added a provision to § 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once this exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release, or (2) be at least 70 years old, have served 30 years in prison, and have the Director of BOP determine that the defendant is not a danger to the public. Id. Additionally, a court, in considering a reduction in sentence pursuant to § 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States Sentencing Commission. Id. This includes United States Sentencing Guideline § 1B1.13. Section 1B1.13 essentially

reiterates the requirements of § 3582(c)(1)(A), with the additional requirement that a defendant not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2); see also Beck, 425 F. Supp. 3d at 578. The application notes to § 1B1.13 provide examples of extraordinary and compelling reasons to grant a compassionate release, including when an inmate is suffering from a debilitating medical condition that has "substantially diminishe[d] the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 application note 1(A)(ii).

For over two years, the Sentencing Commission has lacked a quorum and thus has not updated its policy statements on compassionate release since the First Step Act was signed into law in December 2018. Beck, 425 F. Supp. 3d at 579 n.7. Thus, the current phrasing of § 1B1.13 addresses scenarios in which the BOP Director files a motion for compassionate release, but not situations in which an inmate files a similar motion under § 3582. As such, § 1B1.13 provides helpful guidance when considering a motion filed by an inmate, but "it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." Id. at 579; see also United States v. McCoy, 981 F.3d 271, 281 (4th Cir. 2020) ("When a defendant exercises his new right to move

3

for compassionate release on his own behalf . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts."). Therefore, when considering the merits of an inmate's § 3582(c)(1)(A) motion for compassionate release, the court must consider the § 3553(a) factors but is not limited by the policy statements outlined in § 1B1.13. See McCoy, 981 F.3d at 275.

The Government correctly concedes that Harrison exhausted his administrative remedies and the matter is properly before the court. (Doc. 182 at 3.)

Harrison moves for compassionate release due to his medical conditions, specifically asthma and high blood pressure, combined with the risk of COVID-19 in his facility. (Doc. 180 at 6.) A review of his medical records supports these claims. (Doc. 181 at 7, 16, 60.) Harrison is 55 years old. (Id. at 7.) According to the Centers for Disease Control and Prevention ("CDC") adults with moderate-to-severe asthma and high blood pressure "might be at an increased risk" for severe illness from COVID-19. See CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Feb. 22, 2021).

However, and importantly, it appears that Harrison has already contracted and recovered from COVID-19. (Doc. 180 at 6;

4

Doc. 181 at 19.)  His BOP medical records indicate he tested positive on July 31, 2020, and was placed into isolation.  (Doc. 181 at 19.)  During his isolation he was treated for "acute asthma exacerbation" with prednisone, and records indicate he improved. (Id. at 20.)  He was in isolation until at least August 16, at which point his records indicate he reported no complaints.  (Id. at 22.)  Harrison appears to have later reported difficulty in breathing, which resulted in a hospital visit, a continued diagnosis of asthma, and a permanent prescription for an albuterol inhaler.  (Id. at 17.)  The most recent medical records available to the court indicate that as of October 19, 2020, Harrison reported that "his breathing has improved with use of [prescription] inhalers."  (Id. at 7.)  He also reports headaches, blurred vision, and numbness in his left thigh, although it is unclear the precise nature of these complaints.  (Id. at 4.)  His examination results are largely within normal limits, and the physician wrote, "No Significant Findings/No Apparent Distress." (Id. at 12-13.)

A number of other courts that have considered the issue have denied motions for compassionate release filed by inmates who have already contracted and recovered from COVID-19.  See, e.g., United States v. Bogdanoff, 459 F. Supp. 3d 653, 654, 658 (E.D. Pa. 2020) (73-year-old defendant who tested positive for COVID-19 at a facility that was "overrun" by the virus who nevertheless was

5

asymptomatic, in quarantine, and monitored daily by BOP staff); United States v. Russo, 454 F. Supp. 3d 270, 279 (S.D.N.Y. 2020) (denying an otherwise meritorious motion for compassionate release because the defendant tested positive for COVID-19 while the motion was pending); United States v. Baker, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) (defendant who contracted COVID-19 did not show that he was unable to provide self-care while incarcerated, that the BOP was not providing him with adequate medical care, or that he would be safer from any risk of re-infection in home confinement); United States v. Dan, CR. NO. 15-00703, 2020 WL 3453845, at *5 (D. Haw. June 24, 2020) (defendant tested positive for COVID-19, was deemed recovered, and did not claim that he was suffering from any further symptoms).

Part of the rationale for this conclusion is that the primary basis for moving for compassionate release -- to avoid contracting COVID-19 -- is moot if the inmate already has or had the virus. See, e.g., United States v. Mogan, No. CR 14-040, 2020 WL 2558216, at *4 n.29 (E.D. La. May 20, 2020) ("[G]iven Petitioner's current COVID-19 diagnosis, granting his request would not enable him to obtain the relief he sought by filing this motion -- avoiding contracting COVID-19."). Another factor is the quality of care the inmate is receiving within the BOP. See, e.g., United States v. McCollough, No. CR-15-00336, 2020 WL 2812841, at *2 (D. Ariz. May 29, 2020) ("Since Defendant has contracted COVID-19, the

6

relevant questions concern (1) the course of his illness, (2) the state of his health, (3) his prognosis, and (4) the adequacy of the care and treatment being provided to him in BOP given his pre-existing conditions."). Yet another consideration is protecting the broader community. See, e.g., United States v. Davis, No. 06-20020-002, 2020 WL 4049980, at *1 (C.D. Ill. July 20, 2020) ("[T]he Court denied Defendant's [first] motion for compassionate release, finding that releasing Defendant into the community while he had COVID-19 was a danger to the safety of the community.").

The court is sensitive to Harrison's medical conditions and is aware that it is precisely because of these issues and a fear of the risk of COVID-19 that he filed for compassionate release. Nevertheless, the court agrees with the Government that it would be inappropriate to release him at this time. A review of his medical records tends to show that Harrison received adequate care and treatment from the BOP while he had COVID-19. (See Doc. 181 at 7-43.) He tested positive for COVID-19 on July 31, 2020, and was placed in isolation even before he reported any symptoms. (Id. at 43.) During and after his quarantine Harrison reported increased difficulty in breathing due to his history of asthma, which resulted in a prescription for an albuterol inhaler; Harrison reports that "his breathing has improved with use of [prescription] inhalers." (Id. at 7.) He is also prescribed medication for his hypertension. (Id. at 10.)

7

Harrison moved for compassionate release because he feared his medical conditions would put him at greater risk should he contract COVID-19. (Doc. 180 at 6.) While he unfortunately contracted the virus, he fortunately appears to have been appropriately treated by the BOP such that he was able to be released into the general population. The BOP has continued to monitor his breathing issues, and he appears to be responsive to treatment. (Doc. 181 at 7.) Harrison has presented no evidence that the BOP is unable to provide adequate care or that he otherwise lacks "the ability . . . to provide self-care within the environment of a correctional facility." See U.S.S.G. § 1B1.13 application note 1(A)(ii).

In addition, Harrison has provided no evidence that he is at risk of re-contracting the disease. While medical research has not yet indicated the likelihood of re-contracting the virus or the effects of a subsequent infection, the court notes two recent studies suggest that those who have contracted the virus may have immunity for at least five months and, were they to become reinfected, less severe symptoms. See Dr. Francis Collins, NIH Director's Blog, Two Studies Show COVID-19 Antibodies Persist for Months (Oct. 20, 2020), https://directorsblog.nih.gov/2020/10/20/two-studies-show-covid-19-antibodies-persist-for-months/ (last accessed Feb. 22, 2021) (reporting on two studies that suggest "that people who survive a

COVID-19 infection continue to produce protective antibodies against key parts of the virus for at least three to four months after developing their first symptoms [although] some other antibody types decline more quickly . . . While longer-term study is needed, the findings lend support to evidence that protective antibody responses against the novel virus do persist"); Public Health England, Past COVID-19 infection provides some immunity but people may still carry and transmit virus (Jan. 14, 2021), https://www.gov.uk/government/news/past-covid-19-infection-provides-some-immunity-but-people-may-still-carry-and-transmit-virus (last accessed Feb. 22, 2021) (reporting on a study of 20,787 healthcare workers in England that suggests "naturally acquired immunity as a result of past infections provide 83% protection against reinfection, compared to people who have not had the disease before," observing that this "appears to last at least for 5 months from first becoming sick," and noting that only two of the 6,614 workers who tested positive for COVID-19 were later deemed "probable" for reinfection).  Of course, this research is in its infancy and the results are tentative.  But it does suggest that reinfection, if it exists, is rare.  For its part, the Centers for Disease Control and Prevention is currently studying the issue and reports, "Cases of reinfection with COVID-19 have been reported, but remain rare."  See Reinfection with COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/your-

health/reinfection.html (last accessed Feb. 22, 2021).[1]

Given Harrison's medical conditions, his successful recovery from COVID-19, the availability of treatment at his facility, and the lack of current COVID-19 cases at FCI Loretto, the court finds that no extraordinary and compelling reasons support his compassionate release.

Even if extraordinary and compelling reasons existed, early release would not be appropriate in this case in light of the § 3553(a) factors.

Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). The court must consider -—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

---

[1] Further, the court notes that FCI Loretto, where Harrison is housed, currently has no confirmed cases of COVID-19 among the inmate population. See https://www.bop.gov/coronavirus/ (last accessed Feb. 22, 2021.) This does not minimize the prior outbreak, which resulted in 700 inmates and 49 BOP staff contracting the virus. Fortunately, all have recovered. See id. While the situation appears to be improving at FCI Loretto, the court further notes that the BOP has begun administering COVID-19 vaccines with over 50,000 doses administered in total, including full inoculations for 115 BOP staff and 65 inmates at FCI Loretto, although it is unclear when Harrison will receive a vaccine. Id.

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence[s] and the sentencing range established for [the applicable offense category as set forth in the guidelines] . . .;

(5) any pertinent policy statement . . . by the Sentencing Commission . . .;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Id.  As detailed below, these factors weigh against Harrison's release.

As the Government points out, Harrison executed a tax fraud scheme that defrauded the United States of over $43 million in payroll taxes.  (Doc. 182 at 14.)  As noted in the Presentence Report, "By the mid-2000s, [Harrison's] staffing companies employed thousands of individual workers annually.  Nevertheless, with few exceptions, [his] companies . . . failed to pay over millions of dollars in taxes withheld from employee paychecks, including federal income taxes, Medicare and Social Security taxes."  (Doc. 174 ¶ 9.)  To conceal the fraud, Harrison used numerous separate companies as well as fraudulent bank statements

11

and provided false documents to the IRS.  (Id. ¶¶ 11, 21-26.)  He used the money to pay for his personal residence, a luxury beach house, a yacht, and to fund two commercial motion pictures.  (Id. ¶ 18.)  Harrison also failed to file personal income tax returns for multiple years.  (Id. ¶ 39.)  A sentence reduction in this case would not adequately reflect the seriousness of his offense, promote respect for the law, or provide just punishment for the offense as required by § 3553(a).

Because the court finds that Harrison's early release would be inappropriate for the reasons discussed, it is unnecessary to consider whether any release plan would suffice.  See 28 C.F.R. § 571.61(a)(2) (requiring a detailed release plan for compassionate release requests).

To the extent Harrison asks this court to order home confinement, that request will be denied.  "The BOP has exclusive authority to determine [the] defendant's place of imprisonment, including home confinement, and the BOP's placement decisions are not reviewable by any court."  United States v. Gray, NO. 4:12-CR-54-FL-1, 2020 WL 1943476, at *3 (E.D.N.C. Apr. 22, 2020) (internal quotation marks omitted).  As a result, the court is without jurisdiction to order BOP to place Harrison on home confinement.  Id.  In other words, it could not do so if it wanted to.  Furthermore, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020),

12

does not provide this court with authority to order home confinement.  <u>Gray</u>, 2020 WL 1943476, at *3.  Therefore, Harrison's request for home confinement is denied.

    For the reasons stated,

    IT IS THEREFORE ORDERED that Harrison's motion for compassionate release (Doc. 180) is DENIED.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge

February 22, 2021